**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:   1:21-cv-02859

CROCS, INC.,

      Plaintiff,

v.

JOYBEES, INC., a Colorado corporation, and
KELLEN MCCARVEL, an individual,

      Defendants.

---

## CROCS, INC.'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

---

Plaintiff Crocs, Inc. ("Crocs"), by and through undersigned counsel, files this Complaint against Defendants Joybees, Inc. ("Joybees") and Kellen McCarvel (together "Defendants") and alleges as follows:

### <u>INTRODUCTION</u>

1.    This is an action to address the blatant theft of corporate information by Crocs' former employee, Kellen McCarvel, as part of a scheme to use Crocs' proprietary business and customer information for his own benefit and to gain an unfair advantage in launching Joybees, now a direct competitor of Crocs, that sells knockoff casual footwear products and trade off of Crocs's goodwill.

2.    A few days before McCarvel left his position at Crocs, he systematically downloaded and copied to his personal devices thousands of Crocs' proprietary documents that were essentially a blueprint to start a competitive company.  McCarvel stole documents containing

Crocs' most confidential and highly protected information, including customer contact lists with purchase histories, manufacturing costs and global pricing strategies, compilations of the historical and forecasted customer trends and product seasonality, sales and marketing strategies to target groups of customers and consumers, the internal training manuals for customer service and consumer experience, information concerning manufacturing logistics, and the strategy and terms of licensing and manufacturing agreements. In short, McCarvel methodically copied and stole information and work product from Crocs that laid out every step of the process to design, manufacture, and sell a similar product through McCarvel's own new competing company.

3.     At the time he left Crocs and stole thousands of Crocs proprietary documents, McCarvel was a mid-level Crocs manager. Yet, after taking the information he needed from Crocs, McCarvel was instantly catapulted into the position of Chief Executive Officer of Joybees. Moreover, McCarvel quickly began creating false associations between Crocs and Joybees with the intent to free ride on Crocs' goodwill and compete directly with an overwhelmingly similar product made from the same EVA foam material used to make Crocs.

4.     In 2020, Crocs became concerned that Joybees, through McCarvel, may be using Crocs' proprietary or trade secret information to gain a leg up in its design, manufacturing, and marketing of casual footwear to Crocs' current and prospective customers. As a small start-up company, the comparisons between Joybees' products and Crocs' iconic casual clogs and sandals were striking.

5.     Crocs thereafter conducted an independent computer forensic investigation of McCarvel's company-issued Crocs laptop. This independent investigation revealed that, four days before leaving Crocs, McCarvel created a folder on his company-issued laptop with the inculpatory

name "Take." McCarvel proceeded to download to that "Take" folder over 2,900 documents containing Crocs' most protected and highly confidential business information. As the name of his "Take" folder suggests, McCarvel then took those documents by inserting a USB drive into his company laptop and transferring all of the files contained in the "Take" folder. In addition, Crocs' independent investigation revealed that McCarvel transferred his entire Crocs email inbox onto a USB drive, and his emails likewise contained confidential information.

6.     After Crocs demanded that McCarvel return all of the documents and files he took upon his departure from Crocs, McCarvel initially denied any wrongdoing. However, when confronted with Crocs' forensic evidence of the "Take" folder, McCarvel admitted that he stole Crocs' documents.

7.     Earlier this year, McCarvel signed an affidavit admitting under oath that he created the "Take" folder, transferred the contents of the "Take" folder and his Crocs' email inbox from his company-issued laptop onto a USB drive and stated that "I moved the contents of the flash drive that I used to copy Crocs documents and emails to my personal devices". McCarvel, however, swore under oath that he never accessed any of the stolen documents and emails and that "I confirm that I have sent by courier to Crocs two USBs that contain the documents and emails from Crocs that I took when I left Crocs".

8.     Crocs thereafter had the same independent computer forensic investigator review the contents of the two USBs that McCarvel returned to Crocs. The investigator determined that McCarvel's affidavit was a lie. McCarvel in fact failed to return hordes of documents and files that he originally downloaded to the "Take" folder, and failed to return any of his emails, despite having admitted that he stole his entire email inbox.

9.     McCarvel now acknowledges that he lied in his affidavit in that he did not return all of the documents and emails that he stole from Crocs.  He has now changed his story and for the first time claims that he deleted the hundreds of documents and emails that he did not return.

10.     The Crocs confidential and proprietary documents stolen by McCarvel provided Joybees, a small start-up company whose CEO was formerly only a mid-level Crocs manager, with a blueprint to create a competitive business using the fruits and labors of the millions of dollars that Crocs invested to become the industry leader in this line of footwear.  Joybees is clearly using this information in its current competitive business.  McCarvel is now the CEO of a direct competitor that is manufacturing the same type of footwear as Crocs, trading off of Crocs's reputation, using the same sales strategy, and targeting the same customers.  Moreover, Joybees is perpetuating lies in the marketplace by asserting, for example, that Joybees was launched by the founders of Crocs and that Crocs does not have the ability to fulfill customer orders.

11.     McCarvel's theft and Joybees' use constitutes, among other things, theft of trade secrets, unfair competition, conversion, and unjust enrichment.  Furthermore, Joybees use of Crocs' name constitutes trademark infringement, false designation of origin, and dilution. Accordingly, Crocs seeks damages and permanent injunctive relief requiring Defendants to immediately return Crocs' confidential, proprietary, and trade secret information and preventing Defendants' continued and/or threatened use and disclosure of Crocs' confidential, proprietary, and trade secret information, and from otherwise unfairly competing.

## PARTIES

12.     Crocs is a Delaware corporation with its principal place of business located in Broomfield, Colorado.

13.     Upon information and belief, Defendant Joybees is a Colorado corporation with its principal place of business at 66 S. Logan St, Suite 116, Denver, CO 80209. Joybees produces and sells footwear in various stores throughout the United States.

14.     Upon information and belief, Defendant Kellen McCarvel is a citizen and resident of Colorado.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over each of the Defendants because the acts alleged occurred, in whole or in part, within the Court's District. Moreover, Defendants have committed tortious acts within the District and/or have committed tortious acts outside the District that have caused injury to Crocs within the District.  The Court also has personal jurisdiction over Defendant McCarvel because he is a resident of this district, and over Defendant Joybees because Joybees is a resident of this District and has its principal place of business in this District.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338, as this dispute arises by virtue of Defendant's violations of, *inter alia*, 18 U.S.C. § 1836, *et seq*., as well as 15 U.S.C. §§ 1114 and 1125.

17.     This Court also has supplemental jurisdiction over Crocs' state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Crocs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

18.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District.  Venue is otherwise proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(3), as McCarvel resides in the District and is subject to the court's personal jurisdiction.

## FACTS RELEVANT TO ALL CLAIMS

**A.     Crocs' Confidential, Proprietary, and Trade Secret Business Information**

19.     Crocs is a designer, manufacturer, and marketer of Crocs™-branded footwear for men, women and children, which incorporate Crocs' proprietary closed-cell resin material, Croslite™ – a substantial innovation in footwear comfort and functionality. This proprietary material enables Crocs to produce soft and lightweight, non-marking, odor-resistant shoes, which are ideal for casual wear and recreational uses such as boating, hiking, fishing and gardening.

20.     Crocs™ footwear is sold through a wide range of distribution channels, including major retailers, department stores, specialty footwear stores, sporting goods retailers, and outdoor retailers.  Crocs™ brand footwear is also sold through a variety of specialty channels, including gift shops, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores.  Crocs distributes its products in over 80 countries worldwide.  In addition, Crocs sells its footwear through its websites, including but not limited to, www.crocs.com, and in stores or kiosks in shopping malls throughout the country.  The Crocs™ brand has become well-known for the design, manufacture and sale of distinctive molded footwear and related products worldwide.

21.     Crocs maintains a vast database of confidential and proprietary information and work product on its servers that are used in every aspect of its business, including creating and manufacturing new products, identifying distributors and customers, pinpointing consumer and market trends and product seasonality, developing marketing and sales strategies and related training materials, and analyzing competitive positioning and pricing.

22.     While Crocs' underlying marketing, sales, and customer data and information is considered confidential and not generally known in the public, Crocs has also expended substantial effort and money to compile this type of information into concise materials including visual work product and presentations that are used to market Crocs' products to external retailers and distributors in addition to internal company trainings.  Crocs' materials are highly protected and proprietary because a competing business could easily use this information and the work product itself to duplicate the information for its own external marketing and internal training.  Indeed, these types of documents would be extremely valuable to a new competing business like Joybees, because they provide an end-to-end playbook for how to set up, operate, and successfully sell casual footwear.

23.     For example, Crocs protects the confidential and proprietary information concerning its network of distributor, dealer, supplier, and retailer customers across the world that have made Crocs successful in a highly-competitive market for casual and recreational footwear. While the retailers and stores carrying Crocs shoes can be identified on Crocs' website, the names of the decision-makers within such organizations, their specific product purchase history, and the terms of their contracts with Crocs are kept confidential.  In addition, the identity of, and business strategy for, prospective retailers, partners, and customers, as well as any information learned during negotiations with such parties, took substantial time and effort to compile over a period of decades and is also considered proprietary by Crocs.

24.     Crocs includes confidentiality clauses in all of its agreements with retailers, manufacturers, or distributors.  The names of prospective retailers, manufacturers, or distributors, the financial information, and the different negotiated terms related to the existing contracts with

Crocs' retailers, manufacturers, or distributors is not available to the public and would be of immense economic value to Crocs' competitors in the shoe industry. Crocs has also compiled highly-sensitive information concerning the key differences in the contract terms with each of its retailers, manufacturers, or distributors. Moreover, the agreements themselves that Crocs has negotiated, used, and refined over decades can easily be used by a competitor as a template for contracting with distributors and manufacturers.

25.     Since its founding, Crocs has also invested substantial sums of time and money to develop a customized set of sales and marketing training materials for its global employee workforce. The employee training materials consist of PowerPoint decks that have been prepared and refined by experienced senior employees and managers over the course of several years which are used in various internal company trainings and meetings in order to train and educate Crocs' employees about Crocs' global sales strategies, market forecasts and trends, protecting Crocs' intellectual property, and promoting a cohesive global brand for Crocs. The vast majority of Crocs' marketing and employee training materials are expressly marked "Confidential" and/or "For Internal Use Only," or are orally designated as such during any training or presentation to Crocs' employees.

26.     Over time, Crocs has made a concerted effort to compile sophisticated data and visual work product concerning Crocs' brand positioning in the marketplace, historical and forecasted market trends for the casual footwear segment, and the actual and forecasted Crocs sales, margins, inventory, and seasonality of specific lines of Crocs footwear. Crocs has even hired seasoned employees with specific market experience to compile market research and internal sales information to prepare detailed market forecasts for specific customers or casual footwear

products.  This type of inside information is not publicly available or even ascertainable from outside the company at this level of detail.  Crocs' work product provides a direct competitor like Joybees with extremely valuable information concerning when to time the market for the optimal manufacture and sale of casual footwear products as well as a ready-to-use template for marketing and pitching products to retailers or other customers.

27.     Crocs also maintains highly confidential spreadsheets containing Crocs' sensitive financial information concerning the manufacture, distribution, and sale for various lines and styles of Crocs' shoes, including but not limited to the specific cost of goods, production costs, distribution costs, wholesale price, and suggested retail prices.  This pricing information is considered proprietary by Crocs and is not disclosed to the public.  Moreover, the spreadsheets themselves contain detailed information and formulas for tracking financials for each product line or segment.  These Crocs spreadsheets were created at Crocs over many years and allow a new company, like Joybees, to piggy back on Crocs' substantial time and effort to craft a system for compiling and analyzing sales information regarding specific product and market segments simply by copying and pasting Crocs' spreadsheet template.

28.     Crocs takes measures to ensure that its employees and executives protect Crocs confidential information and trade secrets, including by the following:  (1) Crocs employees are notified during the new hire on-boarding process that they are required to maintain confidential information in strict confidence both during and after their employment with Crocs; (2) Crocs requires its employees to read its Code of Ethics, which contains a confidentiality policy, and complete and acknowledge that they have completed Crocs' Code of Ethics training on an annual

basis; and (3) Crocs also requires its employees to complete other compliance training programs concerning the treatment of Crocs' confidential and proprietary information.

**B.      Kellen McCarvel's Confidentiality Obligations with Crocs**

29.      Kellen McCarvel is the son of former Crocs CEO, John McCarvel.  In 2012, Crocs hired Kellen McCarvel in an entry-level role as a Sales Planning Coordinator-Golf.

30.      After approximately two years, McCarvel transitioned to the role of Commercial Manager, Latin America, where he assisted in managing distributor accounts within an assigned territory and was responsible for the back office alignment of data, resources, and analysis to meet Crocs' objectives in Latin America.  He was later promoted to Merchandise Manager, Latin America, where he was responsible for implementing regional merchandising strategies and goals and reported to the Director of Wholesale Merchandising.

31.      All of McCarvel's positions at Crocs were mid-level positions that required no more than 2 to 5 years of general sales or merchandising experience.

32.      McCarvel's employment offer letter expressly stated that:

As indicated in the Company's Employee Confidentiality, Invention Assignment, Non-Solicitation and Non-Competition Agreement, employees of the Company may become privy to information that is confidential and/or intended for Company use only.  As such, all employees are required to maintain such information in strict confidence both during and after their employment with the Company, and to comply with all terms of such agreement.

33.      McCarvel also received a copy of Crocs' Employee Confidentiality, Invention Assignment, Non-Solicitation and Non-Competition Agreement, which expressly provided that:

1.2.      Employee's Use of Confidential Information. Employee shall at all times during and after the term of this Agreement, maintain the confidentiality of the Confidential Information. Employee shall not, without Company's prior written consent, directly or indirectly: (i) copy or use any Confidential Information for any purpose not within the scope of Employee's work on Company's behalf; or (ii)

show, give, sell, disclose or otherwise communicate any Confidential Information to any person or entity other than Company unless such person or entity is authorized by Company to have access to the Confidential Information in question. …

1.4.    Return of Material. Employee agrees that, upon request of Company or upon termination (whether voluntary or involuntary), Employee shall immediately turn over to Company all Confidential Information, including all copies, and other property belonging to Company or any of its customers, including documents, disks, or other computer media in Employee's possession or under his/her control.

34.    Additionally, McCarvel received copies of, completed training in, and acknowledged Crocs' Code of Ethics on an annual basis, which provided that: "[w]hether or not subject to a confidentiality agreement, employees have a duty to safeguard all Confidential Information of Crocs….   Unauthorized disclosure of Confidential Information could cause competitive harm to Crocs or its customers and could result in legal liability to the employee and Crocs."

35.    Therefore, McCarvel was fully aware of what information Crocs considered confidential and was aware of his obligations with respect to such information during and after his employment with Crocs.

**C.    Just Four Days Before His Departure from Crocs, McCarvel Created an Electronic Folder on His Laptop Named "Take" and Proceeded to Access and Move to That "Take" Folder Over 2,900 Crocs Confidential Documents Which He Accessed and Transferred Onto a USB Drive**

36.    In or around May 2018, McCarvel announced his intention to voluntarily leave his employment position at Crocs.

37.    Upon information and belief, McCarvel already had plans to form a new shoe company, Joybees, that would create similar knockoff injection-molded footwear and compete directly with Crocs.   Indeed, McCarvel's LinkedIn profile indicates that he became CEO of

Joybees in November 2018—just five months after his departure from Crocs.  In January 2020, McCarvel publicly launched Joybees, which is now a direct competitor of Crocs.

38.     Given the similarities between Crocs and Joybees footwear products, Crocs became concerned that McCarvel may have retained Crocs' proprietary and confidential information in order to gain an unfair competitive advantage with Crocs.  A review of McCarvel's company-issued laptop revealed that on June 11, 2018 – just four days before his departure from Crocs – McCarvel created a folder named "Take" on his laptop.  He then accessed and gathered over 2,900 documents from Crocs' files and systems, which he put into that "Take" folder, including various subfolders titled: "Asia," "Europe," "LATAM," "S.M.I.L.E.," "SS19 GAR," and "SS19 RAF Presentations" to name a few.

39.     Crocs' independent forensic investigation further revealed that, on June 14, 2018, just one day prior to McCarvel's last day of employment, McCarvel inserted a personal USB drive and saved copies of the documents contained in the "Take" folder onto his USB drive.

40.     The more than 2,900 Crocs documents and files that appear to have been copied from the "Take" folder to McCarvel's personal USB drive contain (1) highly confidential and proprietary customer lists with specific contact information and purchase history from Crocs' customers and distributors; (2) hundreds of Excel spreadsheets that include Crocs' confidential global and regional margin of costs of goods and pricing for various lines and styles of Crocs™ footwear; (3) dozens of confidential PowerPoint presentations with Crocs' marketing strategies for various shoe styles, regions, and market segments, including Crocs' strategies for marketing partnerships with influencers, celebrities, and charities; and (4) multiple copies of Crocs' templates, drafts, and final terms of its confidential regional and global distributor agreements.

41.     An independent forensic analysis of McCarvel's laptop hard drive confirms that the documents contained on his personal USB drive include the most sensitive of Crocs' confidential and proprietary information.  The type of information that McCarvel stole would of course be highly useful to a direct competitor of Crocs that is attempting to establish its own relationships with Crocs' customers, determine a competitive price for its products, develop a marketing strategy and employee training materials, and draft and negotiate the terms of distributor agreements.

42.     Crocs' forensic investigation also shows that McCarvel took a copy of his entire Crocs email account by creating several "KMcC Email Backup" files that were saved to the same personal USB drive.  A manager in McCarvel's position regularly received Crocs' confidential information by email and the backup files that were taken by McCarvel likely contain other confidential and proprietary information of Crocs, aside from the over 2,900 confidential documents that McCarvel moved to his "Take" folder and transferred to a USB drive.

43.     Upon his departure from Crocs, McCarvel returned his company-issued laptop. However, McCarvel did not disclose the existence of the USB drive or make any effort to return the USB drive or documents contained thereon to Crocs.

44.     Upon information and belief, McCarvel also retained copies of Crocs' confidential and proprietary documents on his personal laptop or devices during the course of his employment with Crocs that he has not deleted or returned to Crocs.

45.     McCarvel's taking of Crocs' proprietary and confidential information on the eve of his departure and immediately before assuming his current role as CEO of Joybees—a direct-competitor of Crocs—violates the terms of his Crocs employment and confidentiality agreements he agreed to abide by.

**D.    McCarvel Admitted That He Stole Crocs' Proprietary and Confidential Documents and Then Signed a Perjurious Affidavit Falsely Stating That He Returned All of the Documents He Stole**

46.    After conducting an independent forensic investigation, Crocs sent several letters to McCarvel and his attorney demanding that he return all copies of the "Take" folder and any and all other documents he took containing Crocs' confidential and proprietary information.

47.    McCarvel initially responded through his attorney, acknowledging that McCarvel downloaded personal and business information during the course of his employment, but denying any wrongdoing. He refused to return Crocs' documents.

48.    After Crocs confronted McCarvel with the results of its independent forensic investigations showing McCarvel created and copied the "Take" folder from his company-issued laptop, McCarvel was forced to admit he stole Crocs' documents.  Crocs also sent additional correspondence to McCarvel's attorney outlining the relevant provisions of the employment and confidentiality agreements and the Crocs Code of Ethics that required McCarvel to return documents containing Crocs' proprietary and confidential information.

49.    On April 7, 2021, McCarvel executed an affidavit, sworn to under oath, and admitted that he downloaded Crocs documents and placed them into the "Take" folder he created on his computer.  He further admitted that he transferred those documents and his "entire Crocs e-mail box" onto a flash drive, which he "used to copy Crocs documents and emails to my personal devices."

50.    McCarvel also swore under oath in his affidavit that he has "not accessed nor used any of those documents and emails" that he copied to his personal devices, and that he "deleted and do[es] not retain any Crocs documents on any of [his] personal devices."

51.     McCarvel further promised Crocs that he was returning all of the documents that he stole.  In his sworn affidavit, McCarvel stated that he "sent by courier to Crocs two USBs that contain the documents and emails from Crocs that I took when I left Crocs."

52.     Crocs thereafter received from McCarvel the two USBs that McCarvel stated under oath contained all of the documents and emails he previously took from Crocs.

53.     Crocs then conducted a further independent computer forensic investigation to determine whether the documents on the two returned USBs were the same as the documents and emails McCarvel admitted he took on the eve of his departure from Crocs.

54.     That independent computer forensic investigation demonstrated that, contrary to McCarvel's sworn affidavit stating that "I have sent by courier to Crocs two USBs that contain the documents and emails from Crocs that I took when I left Crocs", McCarvel in fact failed to return hundreds of the documents and files that he originally downloaded to the "Take" folder.  In addition, McCarvel failed to return any portion of his email inbox that he acknowledged in his sworn affidavit that he "transferred onto that flash drive" when he left Crocs.

55.     As an example, many of the documents that McCarvel transferred to his "Take" file and then stole were electronic folders with multiple sub-folders.  Most of the substantive files were contained in the sub-folders.  Crocs' independent computer forensic examination showed that McCarvel returned a number of the electronic folders, but failed to return the substantive sub-folders.

56.     Accordingly, McCarvel's statement in his sworn affidavit that "I have not accessed nor used any of those documents and emails" is plainly false.  If he had not accessed the documents or emails that he stole from Crocs, he would have returned the exact same set of documents.  That

McCarvel returned folders, but not the substantive sub-folders, clearly shows that he in fact accessed those documents.  Moreover, McCarvel admitted that he transferred the Crocs documents and emails "to my personal device*s*".  There can be no explanation of the need to transfer Crocs documents and emails to multiple devices except if there was an intent to access them.

57.     McCarvel's repeated attempts to conceal his theft and retain copies of Crocs proprietary, confidential, and trade secret information, particularly while operating as the CEO of Joybees and directly competing with Crocs, is a blatant violation of his confidentiality obligations under his prior Crocs Employment Agreement and Crocs Code of Ethics, and further violation of federal and state laws.

58.     Upon information and belief, McCarvel remains in possession of Crocs' proprietary trade secrets and confidential information.

**E.     Joybees' Use of Crocs' Confidential and Proprietary Information**

59.     Since its inception, Joybees has sought to capitalize off of Crocs' brand and goodwill in the marketplace and, upon information and belief, has used the confidential, proprietary, and trade secret information McCarvel stole from Crocs in order to piggy back on Crocs' efforts in setting up its own competing business and gain an unfair advantage in the marketplace.

60.     In or around January 2020, Joybees issued a press release announcing the launch of its injection-molded footwear product line and highlighting that "Joybees board member and

advisor John McCarvel and CEO, Kellen McCarvel, have deep roots in the injection-molded footwear industry as they served as CEO and merchandise manager for Crocs, respectively."[1]

61.     In fact, Kellen McCarvel was previously a mid-level manager at Crocs.  He then launched his own company as the CEO of Joybees after having stolen thousands of proprietary documents relating to, for example, Crocs branding, manufacturing, marketing strategy and customer information.  When caught red-handed, he then signed a perjurious affidavit claiming that he was returning all of the documents without ever having accessed them.   All the while, it is apparent that McCarvel, who had no prior experience running a footwear company, has used the confidential documents that he stole as the CEO of Joybees as a direct competitor and has continued to peddle the misconception that Joybees is a spinoff of Crocs and that its products are the next iteration of the original Crocs footwear.  Joybees' actions in developing a substantially similar product and promoting their product line as if it were related to Crocs has caused substantial consumer confusion in the marketplace.

62.     Crocs has also learned that Joybees has attempted to capitalize on its perceived inside knowledge of Crocs' business and manufacturing practices by having its account managers make false reports to Crocs' current customers concerning Crocs' inventory and ability to meet new product orders in an effort to squeeze Crocs out of its longstanding distributor and retailer relationships.

---

[1] *See* https://www.prnewswire.com/news-releases/denver-based-shoe-retailer-joybees-announces-launch-into-global-shoe-market-300988969.html.

63.     Joybees' past and current marketing practices have caused and will continue to cause consumer confusion and deception in the public that Joybees' knockoff shoe line is related to the original Crocs shoes or brand.

64.     As Crocs continues to uncover and/or receive additional evidence of Defendants' wrongdoing, which are largely in the possession of the Defendants, Crocs reserves the right to amend its Complaint as appropriate.

**F.      Crocs Owns Valuable Trademark Rights in its Famous Word Mark**

65.     Crocs owns valuable rights in the word mark "CROCS", which is registered as U.S. Trademark Registration No. 3,836,415 ("the Word Mark," or "the Crocs Word Mark") (attached hereto as Exhibit 1).

66.     The Word Mark encompasses several standard character marks for "CROCS", which are registered for use in footwear and in lightweight, slip-resistant footwear specifically. The Word Mark was first used in November 2002.

67.     The Word Mark is on the Principal Register of the United States Patent and Trademark Office ("PTO").

68.     The Word Mark was not subject to a prior registration or unsuccessful registration.

### *The Crocs Word Mark Is Famous*

69.     As set forth below, the Word Mark is widely recognized by the general consuming public of the United States as a designation of origin of the footwear products that are manufactured, sold, distributed, and promoted by Crocs. In particular, the Word Mark is widely publicized both by Crocs and third parties; products bearing the Word Mark are sold extensively

throughout the United States; the Word Mark is widely recognized by the consuming public; and the Word Mark enjoys incontestable federal trademark registration.

70.     Crocs distributes its iconic footwear through a vast network of domestic distribution channels, including major retailers and department stores such as Nordstrom, Journeys, Foot Locker, Finish Line, Urban Outfitters, Shoe Carnival, Designer Shoe Warehouse, and Famous Footwear; sporting good and outdoor retailers such as REI, Dick's Sporting Goods, and Academy Sports; and online retail outlets like Zappos.com, Shoes.com, and Amazon.com. Crocs also distributes its footwear through various and sundry specialty channels, including gift shops, collegiate bookstores, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores. Crocs footwear is available for sale in countless store locations domestically, and in over 90 countries worldwide. In addition, Crocs sells its footwear through its website, www.crocs.com, and in Crocs' own retail stores all over the world.

71.     Crocs' iconic Classic Clog was conceptualized during a sailing trip and originally presented to consumers as a boat shoe. Soon after, it became apparent that the shoe appealed to consumers of all demographics seeking fun and friendly, comfortable footwear. By 2005, Crocs shoes bearing Crocs' iconic designs and the Word Mark had become recognized as a new standard-bearer in the fashion footwear, professional footwear, and casual lifestyle footwear markets.

72.     Indeed, over the last two decades Crocs has produced a variety of lines of footwear that bear the Crocs Word Mark and Crocs' unique designs.

73.    For example, images of Crocs Classic Clog are shown below. As can be seen, they clearly bear the Crocs Word Mark:



74.     Other products sold by Crocs also bear the Word Mark, including the Crocs Classic Lined Clog, and the Crocs Bistro Clog. Representative images of these products are shown below:[2]



**Crocs Classic Lined Clog**



**Crocs Bistro Clog**

---

[2] Like the Crocs Classic Clog, both the Crocs Classic Lined Clog and Crocs Bistro Clog bear the Word Mark on the outsole of the shoe, which is not pictured.

75.     These footwear products are marketed for men, women, and children of all ages. Crocs' customers come from all backgrounds, occupations, education and income levels, and geographic regions in the United States. Accordingly, the Crocs Word Mark is featured on all types of footwear, including boots, flip-flops, sneakers, flats, platforms, sandals, wedges, and slides.

76.     Through unconventional collaborations with different brands, celebrities, and artists, Crocs iconic shoes continue to reach diverse and specific psychographic market segments as the shoe is regularly repackaged into new footwear models bearing the Crocs Word Mark. The list of these partnerships includes modern pop artists like Justin Bieber and Post Malone, Los Angeles high-fashion apparel brands Pleasures and Chinatown Market, the luxury department store Barney's New York, and fast-food chain KFC.

77.     The Crocs Word Mark also appears in footwear marketed and sold to specific occupational groups, such as the restaurant, hospitality, and healthcare industries. The rise in stay-at-home workers caused by the COVID-19 pandemic has created additional market reach into occupational segments, as working professionals have sought out comfortable, casual footwear for use during the remote workday at home.

78.     Finally, Crocs has generated substantial revenue from the sales of its footwear products bearing the Word Mark. Over the past three calendar years, for example, Crocs has sold millions of pairs of shoes bearing the Word Mark in the United States, corresponding to hundreds of millions of dollars in revenue.

79.     Since its debut, Crocs footwear bearing the Crocs Word Mark has received substantial publicity. By 2006, Crocs had already morphed into "a global phenomenon" thanks to

the shoes distinctive look and unique name. That same year, the company's success was recognized with a marketing award for garnering more than 800 million editorial impressions.

80.     Public figures caught wearing Crocs shoes in public have helped to keep the media spotlight trained on shoes bearing the Crocs Word Mark. President George W. Bush made international news when he was seen wearing a pair of Classic Clogs. Former First Lady Michelle Obama also drew international attention when she was spotted in shoes with heels bearing Crocs Trademarks. And in the United Kingdom, Prince George caused Crocs footwear sales to skyrocket after he wore a pair of Crocs bearing Crocs Trademarks.

81.     Other celebrities have also kept attention on Crocs by wearing the shoes in public, including television and movie stars like Jack Nicholson, Whoopi Goldberg, John Cena, Shia LaBeouf, Jennifer Garner, and Sacha Baron Cohen, and famous musicians like Ariana Grande, Post Malone and Justin Bieber.

82.     The Crocs Word Mark receives substantial publicity on social media, too. For example, a viral video "Crocs Shaving Cream Challenge" has led to hundreds of thousands of online videos consisting of "filling a Crocs shoe with shaving cream and then jamming your foot in." Similarly, a viral six-second video of a grandmother wearing the classic Crocs shoe has received tens of millions of views. In addition to these viral videos, an almost infinite number of memes featuring the Crocs shoe have spread across different social media platforms, a trend which even Crocs itself has embraced. Indeed, the Classic Clog garnered nearly 25 billion observed media impressions in 2020 alone.

*The Word Mark Is Federally Registered*

83.    The Crocs Word Mark was federally registered on August 24, 2010, as U.S. Trademark Registration No. 3,836,415 (renewed October 4, 2019). The Mark has since become incontestable.

**G.    Joybees Repeatedly, Falsely Implies It Originated from Crocs or Is Otherwise Associated with Crocs**

84.    Since its inception, Joybees has repeatedly attempted to trade off the significant investment Crocs has made in its Word Mark by falsely implying that its knockoff products are associated with Crocs and Crocs' shoes.

85.    As a result, the purchasing public is likely to attribute to Crocs Joybees' use of Crocs' Word Mark as a source of origin, authorization, and/or sponsorship for the products Joybees sells and, further, purchase Joybees' products in the erroneous belief that Joybees knockoffs are authorized by, associated with, sponsored by, or otherwise affiliated with Crocs.

86.    Moreover, Joybees and its agents, employees, and/or officers have made a number of false and/or misleading representations in connection with the sale of their knockoff products. These false and/or misleading representations give consumers the impression that Joybees is affiliated with Crocs, and/or that Joybees is offering the same quality products at a lower price point than Crocs when, in fact, that is not true.

87.    For example, Joybees CEO Kellen McCarvel was interviewed on television by CBS Denver on or about January 23, 2020.[3] During the interview, McCarvel claimed that Joybees' "Splash Sneaker is probably the OG", and stressed his family relationship to a former Crocs

---

[3] A recording of this interview is available at
https://www.youtube.com/watch?v=W3PpmY_VC90.

executive, saying that "through my family was how I kind of first got introduced to the brand of Crocs."

88.     He further claimed during the interview that "I loved my time at Crocs, I learned a ton, and I was ready to use that on my own." The interviewer then states that Joybees is focused on a different demographic than Crocs, with McCarvel stating that Joybees is "really focused on families with young kids."

89.     Similarly, on or about March 27, 2020, a podcast episode of "DiscoPosse" was released featuring an interview with McCarvel.[4] On information and belief, the DiscoPosse Podcast features interviews with various startup founders.

90.     During this interview, McCarvel played up his affiliation with Crocs, stating that he "spent eight years with a major footwear brand you may know called Crocs." McCarvel further claimed that he took the "skillset" he learned working for Crocs to form Joybees, and described his purported career development at Crocs.

91.     McCarvel's statements during these interviews have or are likely to deceive, confuse, and mislead purchasers or prospective purchasers into believing that Joybees products are of a similar quality to Crocs or that Joybees is otherwise affiliated with Crocs. On information and belief, these statements are part of a broader pattern of McCarvel's conduct.

92.     In particular, McCarvel is implying that by virtue of his former employment at Crocs—as a mid-level employee—Joybees products are of the same quality as Crocs Products, and that Joybees products are affiliated with or originated from Crocs when they are not.

---

[4] The Podcast is available at https://discoposepodcast.com/episode-106-startup-lessons-and-happy-feet-with-joybees-footwear-founder-kellan-mccarvel/.

93.     Moreover, on information and belief, Joybees is falsely marketing its shoes to distributors as being produced by the "founders of Crocs." On information and belief, these distributors then repeat that message directly to end-consumers.

94.     For example, one retailer based in Canada posted the following advertisement on social media:



95.     On information and belief, this retailer was merely parroting statements of the U.S.-based officers, agents, or employees of Joybees.

96.     On information and belief, this is a part of a pattern in which Joybees markets itself as being produced by the "founders of Crocs" to distributors in the United States and abroad.

97.     These statements, which incorporate the Word Mark, are false and have the tendency to mislead consumers. The founders of Crocs are and have never been employed by or otherwise affiliated with Joybees.

98.     On the whole, Joybees' misleading statements made to sell its products in interstate commerce have actually confused, or are likely to confuse, a material segment of consumers to whom Joybees has directed its marketing. These misleading statements are material in that they are likely to influence consumers to purchase products from Joybees and cause competitive and other commercial injuries to Crocs.

99.     As provided in further detail below, Joybees' actions are especially likely to confuse consumers given the similar appearance between Crocs' Shoes bearing the famous Word Mark on the one hand, and Joybees' knockoffs on the other hand.

**H.     Joybees' Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

100.    For the sake of clarity, Joybees knockoff products include, but are not limited to, Joybees' "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products and colorable imitations thereof. On information and belief, Joybees sells these and other shoes by drawing affiliation to Crocs despite the absence of any association between Joybees and Crocs. Therefore, and for the reasons set forth below, Joybees infringes and is likely to dilute the Crocs Word Mark.

*Crocs Owned Protectable and Famous Trademark Rights Before Joybees Promoted and Sold its Knockoff Products*

101.     On information and belief, based on the extensive monitoring performed on Crocs'

behalf described above, Joybees began promoting and selling its knockoff products after the Word

Mark was registered and became well-recognized and famous. As stated previously, McCarvel

was an employee of Crocs before forming Joybees.

102.     Further, McCarvel himself has acknowledged that the Crocs Word Mark is famous.

During his interview on the DiscoPosse podcast described above, McCarvel stated that he "spent

eight years with a major footwear brand you may know called Crocs." On information and belief,

this was said in jest, as McCarvel recognized that the interviewer was of course familiar with

Crocs.

103.     The Word Mark relevant to Joybees' violations is also the subject of a duly issued

United States Trademark Registration.

*Joybees' Use of the Word Mark in Connection with its Sale of its Knockoff Products Is Likely to Cause Confusion with the Crocs Word Mark*

104.     Joybees' uses the Crocs Word Mark in connection with its marketing and sale of

goods. In particular, and as described above, McCarvel has during at least two interviews used the

Crocs Word Mark to market the Joybees' knockoff products.

105.     Further, on information and belief, and as described above, Joybees has falsely told

retailers that the shoes are from the "founders of Crocs".

106.     Joybees' use of this Word Mark is likely to cause confusion among consumers, who

are likely to mistakenly believe that Crocs is the source of these knockoff products.

*Joybees Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark*

107.     Joybees' intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from their use of the word "CROCS" to sell footwear products. Joybees is using the exact Word Mark without alteration. On information and belief, this was intentionally done to have consumers associate Joybees and Crocs.

108.     Moreover, the CEO of Joybees was a former Crocs' employee, and he and Joybees have repeatedly tried to draw connection between Crocs shoes that bear the Word Mark and Joybees' knockoff products.

### *Joybees Promotes and Sells its Knockoff Products in Competition with Crocs' Promotion and Sale of Products Bearing the Work Mark*

109.     On information and belief, Joybees promotes and sells its knockoff products through a variety of third-party retailers, and on the Internet at joybeesfootwear.com.

110.     On information and belief, Joybees' knockoff products have been promoted and sold for approximately $25 to $43.

111.     On information and belief, Joybees promotes and sells its knockoff products as casual or lifestyle shoe designed for men, women, and children.

### *Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Joybees' Knockoff Products*

112.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest or at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Joybees' knockoff products when confronted with promotions and sales of Joybees' knockoff products.

### *Joybees' Knockoff Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark*

113.     For the reasons set forth above and due to Joybees' outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between Joybees or its knockoff products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

**COUNT I:  FEDERAL THEFT OF TRADE SECRETS UNDER
THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, ET SEQ.)
<u>(AGAINST ALL DEFENDANTS)</u>**

114.     Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

115.     Crocs maintains confidential and proprietary documents containing: (1) confidential and proprietary customer contact lists, (2) sensitive financial information concerning the margin for its costs of goods and pricing for various lines and styles of footwear, (3) proprietary marketing and employee training materials, and (4) copies of Crocs' templates, drafts, and final terms of its confidential regional and global distributor agreements (the "Proprietary Information").

116.     Crocs maintains the Proprietary Information on a secure system that is password-protected and restricted to authorized employees.

117.     This Proprietary Information is not readily ascertainable or generally known in the public and gives Crocs an economic advantage over its competitors.

118.     Crocs has engaged in reasonable efforts to maintain the confidentiality of the Proprietary Information.  In addition to storing this information on a password-protected and restricted network, Crocs has also sought to protect its confidential nature by limiting its employees' use of the information through confidentiality policies and agreements prohibiting the disclosure of such information to third parties.

119.     This Proprietary Information relates to a product and/or service used in, and/or intended for use in, interstate or foreign commerce.

120.     Crocs' Proprietary Information constitutes "trade secrets" under the Defend Trade Secret Act, as defined in 18 U.S.C. § 1839(3).

121.     Defendants have acquired Crocs' trade secrets by improper means and have failed to return Crocs' confidential, proprietary, and trade secret information in breach of their employment agreements and confidentiality obligations.

122.     Upon information and belief, Defendants have disclosed and/or are using Crocs' trade secrets for their own benefit, and to Crocs' detriment.

123.     Defendants misappropriation of Crocs' confidential, proprietary, and trade secret information was intentional, knowing and willful, thereby entitling Crocs to recover punitive damages and an award of attorneys' fees.

124.     Upon information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit, and to Crocs' detriment, Crocs' confidential, proprietary, and trade secret information.

125.     As a direct and proximate result of Defendants misappropriation of trade secrets, Crocs has suffered and will continue to suffer, irreparable harm, as well as damages to be proven at trial, but, upon information and belief, at least more than $75,000.

126.     Because Crocs' remedy at law is inadequate, Crocs seeks injunctive relief.  Crocs is threatened with use and disclosure of its confidential, proprietary, and trade secret information and with losing its competitive advantage and goodwill in an amount that may not be possible to

determine. Thus, Defendants must be restrained from use and disclosure of Crocs' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A), and must be compelled to return all of Crocs' trade secrets and confidential information to Crocs.

127.     Crocs has been harmed and will continue to be irreparably harmed by Defendants' actions.  Crocs is entitled to damages, in an amount to be determined at trial, and affirmative actions to protect Crocs trade secret information, including a seizure of all documents or information in Defendants' possession concerning or relating to Crocs' trade secret information, as well as an award of exemplary damages and attorneys' fees.

## COUNT II: VIOLATION OF THE COLORADO TRADE SECRETS ACT
## (C.R.S. § 7-74-101, *ET SEQ.*) (AGAINST ALL DEFENDANTS)

128.     Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

129.     Crocs maintains confidential and proprietary documents containing Proprietary Information, as defined above.

130.     Crocs maintains the Proprietary Information on a secure system that is password-protected and restricted to authorized employees.

131.     This Proprietary Information is not readily ascertainable or generally known in the public and gives Crocs an economic advantage over its competitors.

132.     Crocs has engaged in reasonable efforts to maintain the confidentiality of the Proprietary Information.  In addition to storing this information on a password-protected and restricted network, Crocs has also sought to protect its confidential nature by limiting its employees' use of the information through confidentiality policies and agreements prohibiting the disclosure of such information to third parties.

133.    Crocs' Proprietary Information constitutes "trade secrets" under the Colorado Trade Secret Act, as defined in C.R.S. § 7-74-102.

134.    Defendants have acquired Crocs' trade secrets by improper means without Crocs' consent or knowledge.

135.    Defendants have failed to return all of Crocs' confidential, proprietary, and trade secret information in breach of their employment agreements and confidentiality obligations.

136.    Upon information and belief, Defendants have disclosed and/or are using Crocs' trade secrets for their own benefit, and to Crocs' detriment.

137.    Defendants' misappropriation of Crocs' confidential, proprietary and trade secret information was intentional, knowing and willful, thereby entitling Crocs to recover punitive damages and an award of attorneys' fees under C.R.S. § 7-74-105.

138.    Upon information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit, and to Crocs' detriment, Crocs' confidential, proprietary, and trade secret information.

139.    As a direct and proximate result of Defendants' misappropriation of trade secrets, Crocs has suffered and will continue to suffer, irreparable harm, as well as damages to be proven at trial, but, upon information and belief, at least more than $75,000.

140.    Because Crocs' remedy at law is inadequate, Crocs seeks injunctive relief pursuant to C.R.S. § 7-74-103.  Crocs is threatened with use and disclosure of its confidential, proprietary, and trade secret information and with losing its competitive advantage and goodwill in an amount that may not be possible to determine. Thus, Defendants must be restrained from use and disclosure of

Crocs' trade secrets, and must be compelled to return all of Crocs' trade secrets and confidential information to Crocs.

## COUNT III: COLORADO COMMON LAW UNFAIR COMPETITION
## (AGAINST ALL DEFENDANTS)

141.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

142.    Defendants utilized McCarvel's position as an employee of Crocs to gain access to Crocs' Proprietary Information, as defined above, with the intent of and undertaking actions to divert Crocs' business to that of their competing enterprise, Defendant Joybees.

143.    Defendants have used and are continuing to use Crocs' confidential, proprietary, and trade secret information for their own benefit and for the benefit of Joybees in order to gain an unfair advantage concerning the design, manufacturing, and marketing of similar knockoff injection-molded footwear and compete directly with Crocs.

144.    Upon information and belief, Joybees has capitalized on its perceived inside knowledge of Crocs' business and manufacturing practices by having its account managers make false reports to Crocs' current customers concerning Crocs' inventory and ability to meet new product orders in an effort to squeeze Crocs out of its longstanding distributor and retailer relationships.

145.    Joybees' past and current marketing practices have caused and will continue to cause consumer confusion and deception in the public that Joybees' knockoff shoe line is related to the original Crocs shoes or brand.

146.    Crocs has no adequate remedy at law for the damages caused by Defendant's common law unfair competition, conduct, and activities, and has been irreparably damaged thereby.

### COUNT IV: CONVERSION AND CIVIL THEFT (C.R.S. § 18-4-405) (AGAINST ALL DEFENDANTS)

147.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

148.    Defendants have committed unauthorized assumption and exercised the right of ownership over goods and personal chattels belonging to Crocs to the exclusion of Crocs' rights.

149.    Defendant McCarvel, while employed by Crocs, but acting for his own interest and for the interests of Defendant Joybees, intentionally acquired Crocs' Proprietary Information, as defined above.

150.    The Proprietary Information is of substantial value and Crocs has a possessory or proprietary interest in the Proprietary Information.

151.    Defendants tortuously and/or knowingly obtained, retained, or exercised control over Crocs' Proprietary Information without authorization of Crocs and/or by deceiving Crocs and/or its employees in order to obtain or remove them.

152.    Defendants intended to deprive and/or tortuously deprived Crocs permanently of the value of its exclusivity in its own Proprietary Information or used Crocs' documents and information in such a manner as to deprive Crocs of its use or benefit.

153.    By their actions of retaining, using, and/or disclosing Crocs' confidential information and trade secrets, Defendants have interfered with and deprived Crocs of the ability to exercise control over its property.

154.     As a direct and proximate result of Defendants' illegal and unlawful conversion, Crocs has suffered and will continue to suffer, irreparable harm, as well as damages to be proven at trial, but, upon information and belief, at least more than $75,000.  Pursuant to C.R.S. § 18-4-405, in addition to its other remedies, Crocs is entitled to recover treble damages, costs, and reasonable attorney fees.

155.     Because Crocs' remedy at law is inadequate, Crocs seeks preliminary and permanent injunctive relief.  Crocs is threatened with use and disclosure of its confidential information and trade secrets and with losing its competitive advantage and goodwill in an amount that may not be possible to determine.  Thus, Defendants must be restrained from use and disclosure of Crocs' trade secrets, and must be compelled to return all of Crocs' trade secrets and confidential information to Crocs.

## COUNT V: UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS)

156.     Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

157.     Defendants, through their misconduct, have obtained the significant financial benefit of Crocs' investments in its Proprietary Information to which they are not entitled, as they did not have to invest in developing, managing, or maintaining their own network of customers, market research, records, and information.

158.     As Defendants acquired these benefits intentionally, at Crocs' expense, and with full knowledge of their wrongdoing, equity and good conscience require restitution to Crocs.

159.     Defendants have retained these benefits under circumstances that make it unjust and inequitable for Defendants to retain those benefits without paying Crocs the value of the benefits Defendants acquired.

160.    As a result, Crocs is entitled to recover the significant financial benefits that Defendants have obtained through its misconduct in an amount to be determined at trial.

### COUNT VI: BREACH OF THE DUTY OF LOYALTY
### (AGAINST MCCARVEL)

161.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

162.    Defendant McCarvel owed Crocs a duty to maintain its confidential and proprietary information and trade secrets.

163.    Defendant McCarvel owed Crocs a duty to act in Crocs' best interest and to not compete with or steer business opportunities from Crocs to its competition.

164.    Crocs entrusted Defendant McCarvel with extensive access to its confidential and proprietary information and trade secrets so that he could conduct business on Crocs' behalf.

165.    Defendant McCarvel downloaded documents containing Crocs' confidential, proprietary, and trade secret information and placed them into a "Take" folder he created on his company-issued computer.  McCarvel then transferred the contents of the "Take" folder, along with his entire Crocs e-mail box, onto a flash drive, which he used to copy those Crocs documents and emails onto his own personal devices.

166.    McCarvel took these actions while still employed at Crocs, without Crocs' knowledge or consent.

167.    As an employee of Crocs, Defendant McCarvel owed a duty of loyalty to Crocs.

168.    By downloading and misappropriating Crocs' confidential, proprietary, and trade secret information before resigning, and by using that information for his own use in launching his competing business, Defendant McCarvel breached his duty of loyalty to Crocs.

169.    Crocs has been damaged by Defendant McCarvel's actions and is entitled to the relief requested herein.

## COUNT VII: TRADEMARK INFRINGEMENT UNDER SECTION 32(1) OF THE LANHAM ACT (15 U.S.C. § 1114(1)) (AGAINST JOYBEES)

170.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

171.    As alleged more fully herein, the USPTO has granted Crocs a federal trademark registration for Registered Trademark No. 3,836,415 as set forth above.

172.    Crocs used Registered Trademark No. 3,836,415 in interstate commerce before Joybees began their unauthorized uses of the Word Mark in interstate commerce.

173.    Joybees' unauthorized sales and attempted sales of at least their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products are marketed with Crocs' Registered Trademark No. 3,836,415 to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

174.    Joybees' past and continued sales of at least their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

175.    Joybees' unauthorized use of Crocs' Registered Trademark No. 3,836,415 as set forth above, constitutes use in interstate commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' Registered Trademark No. 3,836,415 in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' Word Mark, in violation of 15 U.S.C. § 1114(1).

176.     As a result of Joybees' continued sale of at least their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" knockoff products with legitimate Crocs Products, but also with the general public, who are confused as to the source of the these knockoff products after they have been sold.

177.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Joybees' Actions.

## COUNT VIII: FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) (AGAINST JOYBEES)

178.     Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

179.     Joybees' use of Crocs' Registered Trademark No. 3,836,415 in the manner alleged herein constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Joybees' commercial activities with respect to Crocs' Registered Trademark No. 3,836,415.

180.     Crocs used Registered Trademark No. 3,836,415 in interstate commerce before Joybees began their unauthorized uses of Registered Trademark No. 3,836,415 in interstate commerce.

181.    The consuming public is likely to attribute to Crocs Joybees' use of Crocs' Registered Trademark No. 3,836,415 as a source of origin, authorization, and/or sponsorship for the products Joybees sell and, further, purchase products from Joybees in the erroneous belief that Joybees are authorized by, associated with, sponsored by, or affiliated with Crocs, when there is no such connection between Crocs and Joybees.

182.    Joybees' actions have been conducted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive the consuming public, to trade upon the quality and reputation of Crocs, and to appropriate Crocs' valuable trademark rights.

183.    Joybees' conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom they have directed their marketing activities.

184.    As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, who are confused as to the source of the knockoff products after they have been sold.

185.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Joybees' Actions.

## COUNT IX - TRADEMARK DILUTION UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c)) (AGAINST JOYBEES)

186.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

187.    Crocs' Registered Trademark No. 3,836,415 is "famous" as defined in 15 U.S.C. § 1125(c). Joybees' use of this mark constitutes a use of this famous mark in interstate commerce.

188.     Crocs used Registered Trademark No. 3,836,415 in interstate commerce—and this Registered Trademark became famous—before Joybees began their unauthorized uses of this Registered Trademark.

189.     Crocs' Registered Trademark No. 3,836,415 is widely recognized by the general consuming public of the United States as a designation of source of goods and services. As set forth above, Crocs' Registered Trademark No. 3,836,415 is widely recognized in the United States and around the world, and consumers instantly recognize the connection between Crocs and this famous mark.

190.     Joybees' sales and offers for sale of at least their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products violate Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Joybees does so intentionally and maliciously. This has the effect of diluting the distinctive quality of Crocs' Registered Trademark No. 3,836,415, as well as tarnishing the goodwill consumers associate with Registered Trademark No. 3,836,415.

191.     As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, as Joybees' conduct lessens the value of Registered Trademark No. 3,836,415 as an identifier of Crocs' goods and services.

192.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Joybees' Actions.

## COUNT X - UNFAIR AND DECEPTIVE TRADE PRACTICES
## (C.R.S. § 6-1-101) (AGAINST JOYBEES)

193.    Crocs incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

194.    Joybees' acts constitute unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*

195.    Joybees' infringing activities have damaged and caused irreparable harm to Crocs and, unless restrained, will continue to damage and cause irreparable injury to Crocs' goodwill and reputation.

196.    Joybees' acts have injured, and will continue to injure, Crocs by, among other things, diluting Crocs' Word Marks, confusing customers, and injuring Crocs' reputation.

197.    Joybees' use of Crocs' Word Marks deceives customers and potential customers regarding the origin of Crocs' goods and services. In particular, Joybees knowingly pass off their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products as legitimate Crocs' products. Joybees did this in bad faith.

198.    In addition, Joybees has traded off of Crocs' popularity and goodwill in marketing, selling, and profiting from their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and "Work Clog" products. Joybees' knockoff products have caused, and are likely to cause in the future, impairment of the distinctiveness of Word Marks due consumers' association with Joybees' similar marks and trade names. Similarly, the reputation of Crocs' Word Marks has been harmed, and is likely to be harmed in the future, through its association with Joybees' similar marks and trade names, which occurs as a result of the promotion and sale of their knockoff "Kid's Splash Sneaker," "Modern Clog," "Kids' Active Clog," "Varsity Clog", and

"Work Clog" products.  This confusion and dilution diminish, or threaten to diminish, the capacity of the Word Marks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

199.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Joybees' actions.

## PRAYER FOR RELIEF

**WHEREFORE,** by reason of the foregoing, Plaintiff Crocs requests that this Court enter judgment in its favor and for relief against Defendants, and each of them, as follows:

(a)    That the Court enter a judgement that:

    1.    Each Defendant has violated the Colorado Trade Secrets Act, C.R.S. § 7-74-101, *et seq.*;

    2.    Each Defendant has committed Theft of Trade Secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*;

    3.    Each Defendant has engaged in Colorado Common Law Unfair Competition;

    4.    Each Defendant has engaged in conversion and civil theft in violation of C.R.S. § 18-4-405;

    5.    Each Defendant has been unjustly enriched;

    6.    Defendant McCarvel has breached his duty of loyalty to Crocs;

    7.    Defendant Joybees has committed trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

    8.    Defendant Joybees has engaged in false designation of origin/unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

    9.    Defendant Joybees has engaged in trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and

    10.    Defendant Joybees has engaged in unfair and deceptive trade practices in violation of C.R.S. § 6-1-101, *et seq.*

(b)    Ordering Defendants to take affirmative actions to protect Crocs' confidential, proprietary and trade secret information, including a seizure of all of Crocs' confidential, proprietary and trade secret information in Defendants' possession and/or their attorney's possession, custody and control within twenty-four (24) hours, together with a signed representation that Defendants, and their attorneys, did not alter, destroy, remove, copy or retain any document, file or information;

(c)    Enjoining Defendants and all of its agents, servants, employees, successors and assigns, and all persons in active concert or participation with Defendants from:

1.      Using, disclosing, or misappropriating Crocs' confidential, proprietary and trade secret information;

2.      Selling, marketing, advertising, importing, or purchasing knockoff products or colorable imitations thereof;

3.      Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols, or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify any of Defendants' goods or services;

4.      Otherwise infringing Plaintiff's Trademarks;

5.      Diluting Plaintiff's Trademarks;

6.      Representing or taking any other action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of Defendants' products or services or as to any authorization, sponsorship, approval, or affiliation relationship between each Defendant and Plaintiff;

7.      Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

8.      Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (1) through (7) above

(d)     That the Court enter an order pursuant to 15 U.S.C. §§ 1116, 1118 requiring Joybees, its agents, servants, officers, employees, successors, and assigns to destroy all knockoff products or colorable imitations thereof that are in each Defendant's possession, custody, or control.

(e)     That the Court enter an order, pursuant to 15 U.S.C. § 1116, requiring Joybees to file with the Court and serve upon Plaintiff within 30 days after the entry of each of the preliminary and permanent injunctions, a report, in writing and under oath, setting forth in detail the manner in which each Defendant has complied with Paragraphs (c) and (d), *supra*.

(f)     That the Court enter an order pursuant to 15 U.S.C. § 1117 awarding all profits received by Joybees from the sales and revenues of any kind made as a result of Joybees' sales of knockoff products and colorable imitations thereof, and damages, to be determined, that Plaintiff has suffered as a result of Joybees' sales and marketing of the knockoff products and colorable imitations thereof.

(g)     That the Court enter an order awarding damages and costs to the fullest extent provided for by Colorado Law, including treble damages under Colo. Rev. Stat. Ann. § 6-1-113 or punitive damages, whichever is greater.

(h)     Awarding Crocs compensatory damages commensurate with the value of its lost business and expectancies, its damaged business relationships, its loss of reputation, the misappropriations of its property and the conversions of its property;

(i)     Awarding Crocs the value of the unjust enrichment to Defendants arising from the misappropriation of Crocs' confidential, proprietary and trade secret information;

(j)     Awarding Crocs restitution and/or the value of the unjust enrichment to Defendants arising from their misappropriation of Crocs' confidential, proprietary and trade secret information;

(k)     Awarding Crocs punitive and exemplary damages for the intentional harm inflicted on Crocs by Defendants;

(l)     That the Court enter an order awarding Plaintiff's pre-judgment and post-judgment interest;

(m)     Awarding Crocs the value of its reasonable attorneys' fees and costs pursuant to at least C.R.S. 7-74-105, *et seq.* and 15 U.S.C. § 1117(a); and

(n)     Awarding Crocs all such further and other relief as this Honorable Court deems just and adequate.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiff hereby demands a trial by jury.

Dated: October 22, 2021                      Respectfully submitted,

                                              */s/ Suneeta Hazra*
                                             Suneeta Hazra
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             1144 Fifteenth Street, Suite 3100
                                             Denver, CO 80202
                                             Tel: (303) 863-1000
                                             Fax: (303) 863-2301
                                             Suneeta.Hazra@arnoldporter.com
                                             *Attorney for Plaintiff Crocs, Inc.*

OF COUNSEL:

**KELLEY DRYE & WARREN LLP**
 Jonathan K. Cooperman *(admission pending)*
 Anne-Marie Mitchell *(admission pending)*
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897